UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

NO.  11-40386

RENE GREEN, INDIVIDUALLY
AND AS HEIR OF JONATHAN
EDWARD BRODY GREEN,

Plaintiff - Appellee

v.

BLITZ U.S.A., INC.,

Defendant - Appellant

On Appeal from the United States District Court for the Eastern District of Texas, Marshall Division, Green v. Blitz, U.S.A., Inc., No. 2:07-CV-372.

### Brief of Defendant-Appellant

David E. Jones, Logan & Lowry, LLP, 102 E. 3rd Street, P.O. Box 452469, Grove, Oklahoma 74345, telephone number 918.786.7511, facsimile number 918.786.5687; Michael Bridwell, Strong, Pipkin, Bissell, & Ledyard, L.L.P., 595 Orleans, Suite 1400, Beaumont, Texas 77701, telephone number 409.981.1000, facsimile number 409.981.1010; Adrienne L. Hernandez, Shook, Hardy, & Bacon, L.L.P., 2555 Grand Blvd., Kansas City, Missouri 64108, telephone number 816.559.2574, facsimile number 816.421.5547, Attorneys for Defendant, Appellant.

# TABLE OF CONTENTS

I.    CERTIFICATE OF INTERESTED PERSONS .............................................. ii

II.   STATEMENT REGARDING ORAL ARGUMENT ................................... iii

III.  TABLE OF AUTHORITIES ............................................................................iv

IV.   JURISDICTIONAL STATEMENT .................................................................1

V.    STATEMENT OF THE ISSUES ....................................................................1

VI.   STATEMENT OF THE CASE .......................................................................2

VII.  STATEMENT OF FACTS ..............................................................................5

VIII. SUMMARY OF ARGUMENT......................................................................26

IX.   ARGUMENT..................................................................................................29

X.    CONCLUSION...............................................................................................56

XI.   CERTIFICATE OF COMPLIANCE .............................................................a

XII.  CERTIFICATE OF SERVICE.......................................................................b

# I.

## CERTIFICATE OF INTERESTED PERSONS

On Appeal from the United States District Court for the Eastern District of Texas, Marshall Division, *Green v. Blitz, U.S.A., Inc.*, No. 2:07-CV-372, Fifth Circuit Case No. 11-40386:

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

- Defendant-Appellant Blitz U.S.A., Inc. is wholly owned by Blitz Acquisitions, LLC.
- There is no publically held corporation which owns ten percent (10%) or more of its stock.
- Appellant's insurers, Ace Westchester and Liberty International Underwriters, may have a financial interest in the outcome of the litigation.
- The opposing law firms and/or counsel in the case are E. Todd Tracy, The Tracy Law Firm, 5473 Blair Road, Suite 200, Dallas, Texas 75231; Matthew B. Flanery and Darren Grant, Grant & Flanery, P.C., 216 W. Erwin, Suite 200, Tyler, Texas 75702; and Melissa Richards Smith, Gilliam & Smith, L.L.P., 303 South Washington Ave., Marshall, Texas 75670.

s/    Adrienne L. Hernandez

Attorney of record for Blitz U.S.A., Inc.

II.

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Blitz U.S.A., Inc. ("Blitz") respectfully requests oral argument. *See* Fed. R. App. P. 34; 5th Cir. R. 28.2.4. Blitz suggests that oral argument would be helpful to the Court because the appeal presents important questions regarding the enforceability of settlement agreement releases; litigants' discovery obligations, including the ongoing viability of the individual-custodian collection method; and whether absence of a formal written litigation hold coupled with routine email server maintenance is per se evidence of document destruction. The appeal also presents issues concerning a federal court's jurisdiction to enter, and the excessiveness of imposing, "scarlet letter" sanctions in a closed, settled case, namely, requiring the filing of the Court's Order in closed, pending, and future cases in other jurisdictions

III.

## TABLE OF AUTHORITIES

Page(s)

CASES

*Andrews v. Holloway,*
   256 F.R.D. 136 (D.N.J. 2009).................................................................30, 54

*Ashcraft v. Conoco, Inc.,*
   218 F3d 288 (4th Cir. 2000) .............................................................................30

*Batson v. Neal Spelce Assocs., Inc.,*
   765 F.2d 511 (5th Cir. 1985) ...........................................................................39

*Beadore v. Stewart's Shops Corp.,*
   RJI No. 45-1-2006-1470, Index No. 2006-2122 (Sup. Ct. N.Y., Saratoga
   Co.).......................................................................................................................26

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)...........................................................................................35

*Bradley v. American Household, Inc.,*
   378 F.3d 373 (4th Cir. 2004) ..............................................................30, 31, 32

*Buckley v. Mukasey,*
   538 F.3d 306 (4th Cir. 2008) ...........................................................................39

*Buffington v. Baltimore Cnty.,*
   913 F.2d 113 (3d Cir. 1990) .............................................................................30

*Calder v. Blitz U.S.A., Inc.,*
   No. 2:07-cv-00387 (D. Utah)...........................................................................26

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.,*
   No. 08-cv-5463, 2011 WL 1792047 (S.D.N.Y. May 11, 2011)........................50

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991).................................................................................30, 54, 55

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
242 F.R.D. 362 – 370...................................................................................44, 45

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
560 F.3d 1291 – 1300 (5th Cir. 2009) ...........................................................44, 54

*Cognex Corp. v. Electro Scientific Industries, Inc.*,
No. 01-CV-10287, 2002 WL 32309413 (D. Mass. Jul. 2, 2002) ......................35

*Compaq Computer Corp. v. Ergonome Inc.,*
387 F.3d 403 (5th Cir. 2004) .............................................................................53

*Crowe v. Smith*,
151 F.3d 217 (5th Cir. 1998) .............................................................................29

*Dempsey v. Associated Aviation Underwriters*,
141 F.R.D. 248 (E.D. Pa. 1992), aff'd, 977 F.2d 567 (3d Cir. 1992) ...............34

*Donald Thornton v. Blitz U.S.A., Inc.*,
No. 5:09-cv-00003 (S.D. Ga.) .......................................................................26, 51

*Dorsey v. Academy Moving & Storage, Inc.*,
423 F.2d 858 (5th Cir. 1970) .............................................................................37

*Elliott v. Tilton*,
64 F.3d 213 (5th Cir. 1995) ...............................................................................29

*Escobar v. City of Houston*,
No. 04-1945, 2007 WL 2900581 (S.D. Tex. Sept. 29, 2007)............................51

*ESN, LLC v. CiscoSystems, Inc.,*
685 F. Supp. 2d 631 (E.D. Tex. 2009), aff'd in part by, 397 F. App'x 630
(Fed. Cir. 2010)...........................................................................................32, 33

*Fleming & Assocs v. Newby & Tittle*,
529 F.3d 631 (5th Cir. 2008) .................................................................31, 33, 55

*Flight Eng'rs Int'l Ass'n, EAL Chapter v. Eastern Air Lines, Inc.*,
301 F.2d 756 – 59 (5th Cir. 1962) .....................................................................30

*Ford Motor Co. v. Edgewood Properties, Inc*,
257 F.R.D. 418 (D.N.J. 2009)......................................................................46, 47

*Gaddy v. Blitz U.S.A., Inc.*,
    No. 2:09-cv-0052 (E.D. Tex., Marshall Div.) ...................................12, 14, 15, 25

*Goldin v. Bartholow*,
    166 F.3d 710 (5th Cir. 1999) ...............................................................................29

*Hart v. Blitz U.S.A., Inc.*,
    No. 2:07-CV-00169 (E.D. Tex.) ..........................................................................11

*In re Convergent Tech. Sec. Litig.*,
    108 F.R.D. 328 (N. D. Cal. 1985) (3d ed.) ...................................................36, 37

*In re United Markets Int'l, Inc.,*
    24 F.3d 650 (5th Cir. 1994) .................................................................................37

*Maguire Oil Co. v. City of Houston*,
    143 F.3d 205 (5th Cir. 1998) ..............................................................................29

*McDonald's Corp. v. Victory Inv.,*
    727 F.2d 82 (3rd Cir. 1984) ................................................................................30

*Orbit One Commc'ns, Inc. v. Numerex Corporation,*
    271 F.R.D. 429 (S.D.N.Y. 2010) ...............................................38, 39, 44, 50, 52

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America*
    *Sec.*,
    685 F. Supp. 2d 456 (S.D.N.Y. 2010) ...............................................................50

*Rimkus Consulting Group, Inc. v. Cammarata*,
    688 F. Supp. 2d 598 (S.D. Tex. 2010)................................. 35, 43, 44, 50, 51, 53

*Senigaur v. Ford Motor Co.*,
    222 F. Supp. 2d 829 (E.D. Tex. 2002)................................................................33

*Steuben Foods, Inc. v. Country Gourmet Foods, L.L.C.*,
    No. 08-cv-561, 2011 WL 1549450 (W.D.N.Y. Apr. 21, 2011) .........................50

*Tango Transp., LLC v. Transp. Int'l Pool, Inc.*,
    No. 5:08-cv-0559, 2009 WL 3254882 (W.D. La. Oct. 8, 2009) .......................50

*Tantivy Commc'ns, Inc. v. Lucent Tech. Inc.*,
    Civ. No. 2:04-cv-79-TJW, 2005 WL 2860976 (E.D. Tex. Nov. 1, 2005) .........52

*United States v. $49,000 Currency,*
    330 F.3d 371 (5th Cir. 2003) ........................................................................37, 42

*United States v. O'Keefe*,
    537 F. Supp. 2d 14 (D.D.C. 2008)......................................................................48

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    269 F.R.D. 497 – 553 (D. Md. 2010) (Appendix of spoliation sanctions
    requirements by Circuit) ....................................................................................50

*Waste Conversion, Inc. v. Rollins Envtl. Servs., Inc.*,
    893 F2d 605 (3d Cir. 1990) ................................................................................30

*Zecaida v. Blitz U.S.A., Inc.*,
    No. 6:09-cv-0283 (E.D. Tex., Tyler Div.)..........................................................25

RULES

FED. R. APP. P. 28(e) .....................................................................................................5

FED. R. CIV. P. 26 .................................................................................36, 41, 43, 45

FED. R. CIV. P. 26(b)(2)(C)(iii) ..................................................................................36

FED. R. CIV. P. 26(b)(5).............................................................................................41

FED. R. CIV. P. 26(g) ..................................................................................................36

FED. R. CIV. P. 37 ..............................................................................................37, 54

FED. R. CIV. P. 37(b) ..................................................................................................55

FED. R. CIV. P. 37(b)(2)..............................................................................................53

FED. R. CIV. P. 60 ......................................................................................................34

STATUTES

18 U.S.C. § 401 ...........................................................................................................30

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. § 1332 ...........................................................................................................1

## Other Authorities

Beisner, John H., *Discovering A Better Way: The Need for Effective Civil Litigation Reform*, 60 Duke L.J. 547, 551 (Dec. 2010)................................34, 35

*Black's Law Dictionary* 846 (Bryan A. Garner ed., abridged 7th ed., West 2000) ...............................................................................................................38

Gonowski, Dean, *Electronic Discovery Cases You Must Know* (May 10, 2011) ...........................................................................................................36

IV.

JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. section 1332. Plaintiff-Appellee Rene Green is a Texas resident. USCA5 32. Defendant-Appellant Blitz U.S.A., Inc. is an Oklahoma corporation with its principal place of business in Oklahoma. *Id.* The amount in controversy exceeded $75,000. *Id.*

This Court's jurisdiction is proper under 28 U.S.C. section 1291. The sanction order was entered in a closed, settled case on March 1, 2011. USCA5 3027 – 3047. Blitz's notice of appeal, filed March 31, 2011, was timely. USCA5 3058 – 3059.

V.

STATEMENT OF THE ISSUES

A.     As a matter of jurisdictional authority and the enforceability of contracts, may a Court award civil compensatory sanctions years after the parties settle a case and exchange releases?

B.     Did the District Court abuse its discretion in finding that Blitz willfully violated its discovery obligations in failing to locate and produce certain documents prior to the *Green* trial?

C.     Is the absence of a formal written litigation hold coupled with routine email server maintenance to free-up space sufficient to establish that relevant

1

documents were intentionally destroyed without evidence of specific, missing electronic documents?

D.   Is requiring that a party file the Court's sanction order in other closed, pending, and future cases excessive and/or outside the jurisdictional authority of the Court?

## VI.

## STATEMENT OF THE CASE

Blitz U.S.A., Inc. ("Blitz") manufactures portable plastic consumer gasoline containers.  On February 16, 2007, Jonathan Green used a Blitz container to pour gasoline on a fire and was burned.  Mr. Green was 20 years old at the time and ultimately died from his injuries.   Jonathan Green's mother, Rene Green ("Plaintiff"), sued Blitz, claiming that the gas can used by Mr. Green to pour gasoline on the fire was defectively designed because it failed to include a "flame arrestor."  Plaintiff argued that when Mr. Green poured gasoline on the flames, fire followed the vapor trail back into the gas can, causing the container to explode. Plaintiff argued that a flame arrestor would have prevented the flame from propagating into the gas can, thereby preventing the explosion.  Blitz argued that the act of pouring gas on a fire was the proximate cause of injury and that a gas can without a flame arrestor is not defectively designed.  Blitz established that flame

arrestors are not required or recommended in consumer cans by any applicable state, federal, or local standard.

The *Green* parties had various pretrial discovery disputes.  Before trial, Plaintiff filed a Motion to Compel Full and Complete Disclosures and for Sanctions, asserting that Blitz was withholding documents related to flame arrestors.  Plaintiff subsequently withdrew her Motion.  The parties tried the *Green* case to a jury from October 15 through October 20, 2008.   During jury deliberations, the parties entered into a high/low Settlement Agreement where they agreed not to appeal the verdict and where Plaintiff agreed to release Blitz from all claims.   The jury returned a defense verdict, finding that the gas can was not defectively designed and that Jonathan Green was solely responsible for his injuries in pouring gasoline on a fire.  Following the verdict, Blitz paid the low to Plaintiff, and Plaintiff executed a Final Release and Indemnity Agreement.

After the *Green* trial, Blitz located documents in existence before the trial, but not produced to Plaintiff Green.  Blitz produced these documents in pending cases, including a later case involving the same plaintiffs' attorney.  Plaintiff moved for sanctions alleging that Blitz had intentionally withheld these documents.

None of the documents at issue were deliberately secreted or destroyed to keep them from being disclosed.   Rather, the documents forming the basis of the underlying Order were simply not located from the reasonable searches performed

prior to the *Green* trial but were subsequently discovered in searches responsive to discovery demands in later cases.  It is noteworthy that the documents at the heart of the Court's Order were produced by Blitz, not some third party.

On March 1, 2011, the Court granted in part and denied in part Plaintiff's Motion for Sanctions.  In its Memorandum Opinion and Order (the "Sanction Order"), the Court held that Blitz willfully violated its discovery obligations in *Green* and failed to preserve documents.  The Court entered a compensatory civil sanction against Blitz and in favor of Plaintiff of $750,000.  However, the Court agreed to extinguish $500,000 of the compensatory civil sanction if, within thirty (30) days of the Sanction Order, Blitz provided the Sanction Order to all other parties involved in litigation against Blitz, including all litigation concluded less than two years prior to the Sanction Order.  Finally, the *Green* Court directed Blitz to file the Sanction Order in all pending cases and future litigation in all state and federal cases, within and outside the Eastern District of Texas, for the next five years.

This appeal concerns a decision of overarching abuse of power.

## VII.

## STATEMENT OF FACTS

A.     The *Green* Case.

On February 16, 2007, Mr. Green was at the trailer home of a friend with a number of other young adults.  Trial Tr. at 47:5 – 9. [1]  They had built a fire in a 55-gallon drum from the scraps of a torn-down shed.  *Id.* at 47:15 – 16.  Mr. Green used a red five-gallon Blitz plastic gas can to pour gasoline onto the fire.  In the midst of pouring the gasoline, his friend told him to be careful because the gasoline could flash back on him.  *Id.* at 47:19 – 23.  Mr. Green went ahead anyway and was burned.  He passed away at the hospital.  USCA5 32.  His mother sued Blitz for his death.  *Id.*

The *Green* case was filed on August 28, 2007.   USCA5 32.   Plaintiff contended that a metal disc or screen, a so-called flame arrestor, could have been installed in the spout or neck of the gas can to prevent flames from following the vapor trail from the gas can back into the container, thereby preventing the container from exploding.  Trial Tr. at 22:7 – 10.  Blitz contended that such a disc was unwise and unnecessary, and that the container was not, therefore, defectively designed or unreasonably dangerous.  *Id.* at 51:14 – 22.  Blitz also contended that

---

[1] The trial and show cause hearing transcripts are unpaginated in the record on appeal so Blitz cites to the transcripts themselves. *See* FED. R. APP. P. 28(e).

Mr. Green was injured because he knowingly poured gasoline on a fire. *Id.* at 46:18 – 21.

B.     Blitz Litigation History and Pre-2009 Document Collection Efforts.

Blitz manufactures portable plastic consumer gas cans and other plastic products in Miami, Oklahoma. Blitz employs about 300 workers, mostly on the manufacturing floor. USCA5 *2799*. [2] Since 2002, Blitz has continually defended cases involving allegations that its gas cans are defectively designed because they do not include flame arrestors. USCA5 2972. During the period in question on appeal, Blitz's acting vice-president actually divided up document requests and visited key custodians. USCA5 *2799*.

Prior to the *Green* trial, Blitz had investigated explosion suppression materials and other devices, including flame arrestors. Larry Chrisco, Blitz vice-president, was either involved in or "headed up" each and every one of these investigations from 1973 through his retirement in September 2007. S.C. Hr'g Tr. at 22:4 – 17. Mr. Chrisco had more knowledge than any Blitz employee concerning the existence and location of documents related to explosion-suppression materials and flame arrestors. *Id.* at 22:18 – 24. Because of Mr.

---

[2] Volume 8 of 9 of the record on appeal inadvertently skips from page 2608 to 2908, affecting docket entry numbers 227 through 246. *See Green v. Blitz U.S.A., Inc.*, No. 2:07-cv-00372 (E.D. Tex. June 30, 2011) [ECF No. 265] Blitz estimated the appropriate page citations based on the docket report index, but will supplement when the paginated version is made available, to the extent necessary. Affected citations appear in italics.

Chrisco's involvement and knowledge of explosion suppression materials, Blitz appointed Mr. Chrisco jointly responsible (along with Thomas Jackson, Blitz controller) for gathering documents through 2003, and solely responsible for collecting documents beginning in early 2004. *Id.* at 22:18 – 24. Each time Blitz received a request for documents, Mr. Chrisco discussed the requests with counsel and developed an understanding of the claims and requests. *Id.* at 21:6 – 17. From there, Mr. Chrisco met with people in all areas of the company to obtain the relevant documents. *Id.* at 24:4 – 12.

Mr. Chrisco requested documents in all forms: "I went to the individuals that I talked about earlier. I said, 'I want anything, whether it's e-mails, electronic, whether it's a letter, any documents you have, I don't care how they were generated, I needed those documents to look for the discovery process around the topics we discussed.'" *Id.* at 78:21 – 79:1. Mr. Chrisco's efforts to collect documents were ongoing: as new cases were filed or new document requests were received, Mr. Chrisco would confer with counsel to understand the new requests and then strike out across the organization seeking responsive or new documents. *Id.* at 23:7 – 21. "I'd go back to the various departments to see if there was anything further. That was a process we went through." *Id.* at 23:21 – 23. Even Plaintiff's counsel recognized the integrity of Mr. Chrisco's efforts, interrupting his own questioning to clear the air:

> First of all [Mr. Chrisco], I'm not—I want you to know right now that
> I'm not suggesting you did anything—that you destroyed any
> documents.

*Id.* at 69:20 – 22.

Mr. Chrisco's testimony resonated with deposition testimony by Mr. Jackson, who worked with Mr. Chrisco on collecting documents during the earlier period. Mr. Jackson described his efforts to respond to discovery requests; he described that documents were likely produced from a mix of media and print sources and that, due to the volume requested, lots of other people were involved. The deposition continued, and Mr. Jackson was asked whether he was confident that, as a result of this process, he was "able to locate and produce all the documents. . . requested in those different categories?" He responded:

> **I—I feel like—I feel like we did a good job. Again, we –we didn't**
> **just have—we didn't just assign that to somebody and say "Go**
> **pull these documents." We had a number of people that were—**
> **that were integral people in those various areas and we said "We**
> **need you to"—"to go find all the documents for these"—you know**
> **"various things."**

USCA5 *2625 – 2626*. Mr. Jackson was questioned about this subject again in a later deposition:

> Q. Who -- tell me -- walk me through the process of how those
> documents responsive to that request would initially be gathered?
>
> **A. Well, typically I probably would have gone through that with**
> **Larry Chrisco's help, and we would have kind of sorted them out**
> **and said, well, all right, these are accounting things, and these are**

> **other areas. And then we'd try to put forth those requests to the different people responsible in those different areas to begin to gather up those things.**

*Id.* at *2626.* Mr. Jackson was asked how he and Mr. Chrisco would divide up tasks

and physically gather documents:

> **Well, again, typically, Larry and I worked on these types of cases together. And if it was a request for some kind of a quality document, then we'd have to get that request out to the quality people to answer that document request. Or if it was an accounting thing, then typically I'd take care of that. And if it was a product development thing, a lot of times he might take care of that. So we'd just have to go back to the proper people that would. . . be best able to answer that document request.**

*Id.* at *2626 – 2627.* When Plaintiff's counsel insinuated that people might have

intentionally disregarded document requests in the absence of a formal, written

policy, Mr. Jackson testified:

> **I think fellow employees of Blitz would have been well aware that they needed to be correct in responding to those types of things. I do not recall any kind of a written policy that addressed that.**

Mr. Jackson was asked, for example, how somebody from the product

development team would have been made aware of the "policy":

> **I think as just normal course of business, if -- if you're asked to produce a document or something, you'd -- you would comply with that.**

*Id.* at *2627.* Mr. Chrisco has also been questioned about formal dictates:

> Q. But my question sir, <u>specifically with regards to document retention</u>, what dictate, if any, was issued at the time that Blitz learned

of Landon Beadore's case to make sure that no documents were destroyed?

**A. Our normal operating procedure back then would have been to, you know, we maintain documents for a period of time. Ah, to my knowledge—[interjection by plaintiff's counsel] there was never anything that was destroyed or not turned over or any—anything that was, ah, made during this or any other litigation.**

[ECF No. 209-7] [3]

Since 2002, plaintiffs in various gas can cases have conducted nearly one hundred (100) depositions of twenty three (23) current and former Blitz employees.  USCA5 2972.  Most of these witnesses have been deposed multiple times.  *Id.*  Although there was not a formal written litigation hold policy until 2009, individual custodians worked with Blitz counsel since 2002 to gather and produce documents.   Current and former Blitz employees also submitted supporting affidavits that even in the absence of a formal litigation hold, they knew they needed to retain documents relevant to gas can litigation and/or never deliberately destroyed relevant documents.  [ECF Nos. 209-4 (Affidavit of Miriam George), 209-5 (Affidavit of Jim Calcagno), 208-9 (Affidavit of David Price), 208-11 (Affidavit of Larry Chrisco (Mar. 5, 2010)), 231-4 (Affidavit of Charlie Forbis); 233-7 (Affidavit of Thomas Jackson), 233-8 (Affidavit of Grant Kernan)]  Before

---

[3] Portions of the record on appeal are sealed and unpaginated so Blitz references the relevant docket entry numbers.

the Show Cause Hearing, Mr. Chrisco also submitted an affidavit detailing his collection efforts.  [ECF No. 233-3 (Affidavit of Larry Chrisco (July 30, 2010))]

The Court's discovery order in this case required Blitz to provide "a copy of all documents…in [its] possession, custody, or control…that are relevant to the pleaded claims or defenses involved in this action" within 45 days of the initial status conference.  USCA5 143 – 149.  To comply with the order, Blitz and Plaintiff entered into an agreement to make use of documents Blitz produced in another flame arrestor case involving the same counsel, *Hart v. Blitz U.S.A., Inc.*, No. 2:07-CV-00169 (E.D. Tex.). USCA5 176 – 177.  Over the course of the next seven months, Blitz supplemented its disclosures more than ten times. USCA5 *2788*.

For example, Blitz produced:

- A 2006 deposition of Blitz head of product development, Charlie Forbis, describing an October 2005 visit to Underwriters' Laboratory to discuss flame arrestors;
- Email traffic setting up the meeting;
- An explosion-suppression materials test report in Blitz's files from the South African Army;
- A 2006 deposition of Blitz President and CEO, Rocky Flick, discussing two other explosion-suppression materials vendors, Excess Explo and FireXX;
- A 1990s license agreement with explosion-suppression materials vendor Excess Explo;
- A 1998 market study where Blitz was trying to determine what consumers would pay for "gas cans less likely to explode";

11

- A 1999 market study intended to explore explosion-proof gas cans and consumer concerns;

- A Blitz evaluation of a safety-style gas can with a free-flow flame arrestor;

- A safety-style gas can brochure with a section about flame arrestors: an explanation of what they are and how they work;

- A 2006 deposition of former Blitz vice-president, Larry Chrisco, discussing the October 2005 meeting with Underwriters' Laboratory, flame arrestor research by Dunbar Engineering, and the Company's fact-finding efforts;

- Old patents for flame arrestors in Mr. Chrisco's files that were printed off by a Blitz employee in product development, David Price; and

- Videos from the marketing group and another explosion-suppression material vendor, Explo-Safe.

S.C. Hr'g Def. Exhs. 4 – 14; S.C. Hr'g Tr. at 10:11 – 13:13. There were approximately 1,000 emails in the production set consisting of 4,000 pages counting emails and attachments. *See generally* USCA5 *2819* (citing *Gaddy v. Blitz U.S.A., Inc.*, No. 2:09-cv-052 (E.D. Tex) (ECF Nos. 108 [at 11], 188 at 6)). Importantly, documents collected by or through Mr. Chrisco in earlier litigation were preserved and produced in later litigation, including the *Green* case.

     C.    Pre-trial Discovery Dispute in *Green.*

On July 16, 2008, while the case was still pending, Plaintiff filed a Motion to Compel and for Sanctions. [ECF Nos. 59, 70] Plaintiff based her 2008 Motion on ". . . a surprising lack of intra-office emails and other correspondence surrounding the use of flame arrestors in your gas cans. Absent their presence on your privilege log, we certainly expect all such documents to be produced." [ECF No. 59 (Exh.

F) (Letter from Mr. Flanery to Mr. Bridwell (Dec. 14, 2007))]  Notwithstanding these allegations, Plaintiff withdrew her Motion before it could be heard and elected to proceed to trial.  USCA5 1853 – 1855.

      D.    The Trial, the Settlement Agreement, and the Final Release.

The parties tried the *Green* case to a jury from October 15 through October 20, 2008.  USCA5 2071 – 2077.  On October 15, 2008, Mr. Chrisco testified on behalf of Blitz.  Mr. Chrisco described Blitz trying to research and understand flame arrestor performance—what they do, their feasibility in consumer containers—and trying to understand their potential, unintended consequences.  Trial Tr. at 10:2 – 11:3.  Plaintiff's own counsel referred to Blitz's flame arrestor "fact-finding," acknowledging that Blitz had investigated flame arrestors.  *Id.*  To downplay these efforts, Plaintiff emphasized that Blitz had never "tested" flame arrestors for use on consumer containers, which Mr. Chrisco agreed had not been done.  *Id.* at 11:4 – 25.

During jury deliberations, the parties entered into a high/low Settlement Agreement where (a) Blitz agreed to pay no less than the "low" and no more than the "high," (b) the parties mutually agreed not to appeal the verdict, and (c) Plaintiff agreed to release Blitz from all claims. USCA5 2336.  The jury returned a defense verdict, finding that the gas can was not defectively designed and that Jonathan Green was solely responsible for his injuries.  USCA5 2345 – 2350.

Following the verdict, Blitz paid the "low" to Plaintiff, neither party appealed, and

Plaintiff executed the Final Release and Indemnity Agreement fully releasing Blitz

from:

> [A]ny and all claims, causes of action, losses, injuries, damages,
> liabilities, costs, expenses and fees (including attorney fees) of any
> kind or description whatsoever in law or in equity, now known or
> hereafter discovered, in any way related to or connected with the
> Occurrence above described as well as any consequence thereof. . . .
> and. . . all other damages, both compensatory and punitive, whether
> direct or indirect, arising in tort, contract, statute, or otherwise, which
> the Plaintiff has, has had, or may have in the future in connection with
> arising from, or related to the Occurrence.

[ECF No. 209 (Exh. 9 at 3)]  The Court entered a final judgment on November 10,

2008.  USCA5 2120 – 2121.

> E.     Expanded Issues and Post-*Green* Document Collection.

Sometime after the *Green* trial, a plaintiff's attorney in another case, *Gaddy

v. Blitz U.S.A., Inc.*, No. 2:09-cv-0052 (E.D. Tex., Marshall Div.), entered into a

"consulting agreement," paying a "fact witness" and former Blitz employee,

William Bailey.  [ECF No. 209 at 7 – 9]  Mr. Bailey was deposed in December

2009.  His allegations were diverse and far-reaching.  USCA5 *2614 – 2615*.

In 2009 and 2010, largely in response to expanding discovery demands,

including those issues raised by Mr. Bailey, Blitz engaged an outside consultant

and collected approximately 137,000 pages of paper documents and an estimated

21 million pages of ESI.  Almost 1 million pages of documents were reviewed.

USCA5 2939.  Of those 1 million pages, about 200,000 pages were ultimately produced.  *Id.*  This production effort involved over 9,000 hours of attorney review time and a total cost to Blitz—exclusive of vendor expenses, employee time lost, and the work of local and trial counsel—of approximately 1 million dollars.  *Id.* Among the newly located and produced documents were those upon which Plaintiff based her post-settlement Motion.

F.     Plaintiff's Post-Settlement Motion for Sanctions.

Approximately a year and a half after the *Green* trial and Plaintiff's execution of the Final Release, Plaintiff moved to sanction Blitz.  Plaintiff's 2010 Motion for Sanctions related to documents Blitz subsequently located and produced in later cases. [ECF No. 195]  On referral from the District Court, Magistrate Judge Charles E. Everingham found the existing record insufficient to support a finding that the perceived discovery deficiencies were willful.  He could only recommend that the District Court hold a Show Cause hearing. USCA5 *2780 – 2792.*[4]

G.     Post-hearing Submissions.

After the show cause hearing on February 1, 2011, the District Court required certain submissions by the parties. USCA5 2937 – 2938.  Blitz submitted

---

[4] Blitz objected to and moved for reconsideration of the Report and Recommendation. USCA5 2793 – 2862.

the affidavits of Paul Hale and David Lamb, Internet technology personnel at Blitz. The affidavits established that in the time before the *Green* trial, it was impossible to perform a key word search across the Blitz email system. USCA5 2981 – 2984 (Affidavit of David Lamb).   During that same time frame, there was no way for Blitz to electronically key word search within documents' content because Windows Server 2003, the system then in place at Blitz, did not have that capability. USCA5 2985 – 2987 (Affidavit of Paul Hale).  It was only after Blitz's June 2009 conversion to a SharePoint server that such searching was possible. *Id.*

Plaintiff's supplemental briefing suggested that Blitz's inability to conduct system-wide key word searches in email did not excuse Blitz from conducting key word searches in an <u>individual</u> user's email account. USCA5 3001 – 3007. Plaintiff submitted testimony that an IT administrator could log into an individual user's account and conduct a key word search. USCA5 3008 –3014.

Mr. Hale testified that an individual user could conduct a key word search in his or her account, or that an IT administrator could log into the individual user's account and complete the same search.  *Id.*  But Mr. Chrisco himself testified that the precise document collection method used by Blitz was individual users searching their own email:

> Q.  Specifically, what did you do, Mr. Chrisco, to search for electronic documents responsive to discovery requests and that would be relevant in the Green case?

**A.  I went to the individuals that I talked about earlier.  I said, "I want anything, whether its e-mails, electronic, whether it's a letter, any documents you have, I don't care how they were generated, I needed those documents to look at for the discovery process around the topics we discussed."**

S.C. Hr'g Tr. at 78:18 – 79:1.

Q.  Okay.   And you would have -- would you asked [sic] Charlie Forbis to turn his e-mails over?

**A.  I asked all the people that I work with and – to take a look at all of the forms of communication, whether that's e-mail, whether that's letters, whatever they may have, I asked them to turn that over, yes.**

*Id.* at 51:15 – 20.

Q.   All right.   And you told us earlier under oath that when you checked your files, you also checked your e-mails, didn't you, sir?

**A.  I checked all sources, e-mails, elect -- I just want to make one point here.   I am about as computer literate -- illiterate as they get.**

Q.  Okay.

**A.  So you -- and -- <u>but I searched everything, e-mails, electronics. I looked at everything where I thought documents could probably be.</u>**

*Id.* at 37:5 – 14.  In response to questioning from the Court, Mr. Chrisco testified

that he did not have conversations with Mr. Hale specific to information

technology and litigation; instead, most of his conversations were with Thomas

Jackson.  *Id.* at 85:6 – 13.  Mr. Jackson worked as Blitz's controller through 2006,

and was primarily responsible for maintenance and development of Blitz's

computer system. [ECF No. 233-7 (Affidavit of Thomas Jackson)]

In addition to testifying at deposition about his individual custodian

collection efforts with Mr. Chrisco, Mr. Jackson submitted a supporting affidavit:

> I was never provided a "litigation hold" notice by counsel. **However, I was fully aware that documents which were relevant to pending or future litigation should not be destroyed even following expiration of the time established in Blitz's document retention policy.**

*Id.* at ¶ 10. He further described that Blitz maintained backup tapes to save a copy

of its electronic servers for a rolling two-week period. Each backup tape was

reused every two weeks to save an updated version of its computer information in

the unlikely event of a catastrophic computer crash or a natural disaster. That

backup tapes were reused did not mean the original information itself was

destroyed. *Id.* at ¶ 11.

The District Court was exceptionally critical of emails from Blitz's IT

department to delete spam or unnecessary email. These emails, for the most part,

were particular in asking employees to delete <u>unnecessary</u> email. USCA5 2549

("Please delete all old and <u>unnecessary</u> files. . . .") (emphasis added), 2560 ("that

you <u>can</u> delete") (emphasis added), 2552 ("that are no longer needed"). The spirit

of these emails is far from nefarious:

18

> With Christmas stuff and Tsunami news, we've all accumulated and are using lots (and lots) of server storage. Please read and view and then delete.

USCA5 2549.

> We are accumulating jpg's everywhere – the new cameras are neat and sharing the photos are really fun but if you send 4 photos as an email attachment to 8 people – then that really means there's 32 photos of space being used in our email system.
>
> . . .
>
> How about if we set up a folder in Public – say – BlitzPhotoFolder-Fun-Family
>
> If you have photos to share, navigate to this folder. . . .

USCA5 2554.

These emails also instructed employees about alternate methods to save email. USCA5 *2648*. In the end, Mr. Hale testified that he was not aware of anyone at Blitz deleting any business-related documents because of these emails. USCA5 *2620*. Mr. Hale testified that it was up to each individual employee whether to delete any email; any employee could have chosen not to delete any email. *Id.* Mr. Hale did not know of anyone at Blitz who had been told to delete any business-related documents or emails. *Id.* The understanding of Blitz employee, David Price, one of three individuals involved in Blitz's flame arrestor fact-finding efforts, was consistent with this important distinction, testifying:

> Q. Did anyone at Blitz or associated with Blitz give you instructions on what type of emails you should keep and what type you should delete?

**A. Spam. Get rid of the spam. It fills up the server.**

USCA5 2318.   In contrast, there was very little email traffic related to flame arrestors, much less any evidence that relevant emails were destroyed.  Mr. Price testified:

> Q. Okay. Now, during the time that you and Charlie Forbis and Larry Chrisco were involved in this investigation regarding flame arrestors, the three of you all or some combination thereof would exchange emails, would you not?
>
> **A. I would say not. Charlie and I sat in the same room. And typically it was verbal conversation where he would say, 'Hey, I want you to come over here and look at this,' you know. It was that type of a --of an environment.**
>
> Q. You were close enough to where you didn't have to email one another?
>
> **A. No. We just talked.**

USCA5 2316 – 2317.

### H.    The District Court's Decision.

Following all briefing and the show cause hearing, the District Court granted in part and denied in part Plaintiff's Motion for Sanctions.  USCA5 3027 – 3047. The District Court held that Blitz acted willfully in failing to produce certain documents in the *Green* case.  *Id.*  The Court implicitly acknowledged that Blitz had neither located the subject documents prior to the *Green* trial nor intentionally withheld or destroyed them.  *Id.*  Rather, the Court determined that Blitz's search efforts were lacking.  *Id.*  Specifically, the Court was critical of Blitz's failure to

run certain searches across its electronic systems, holding that this failure demonstrated the necessary "willfulness" to impose severe sanctions.  The *Green* Court held:  "Blitz had an obligation to conduct such a search.  Perhaps Blitz should not appoint someone to coordinate discovery who is admittedly as 'computer literate--illiterate as they get.'  Or, alternatively, Mr. Crisco [sic] could have at least inquired with the Blitz IT Department regarding a search for electronic documents, which he admittedly did not do."  *Id.* at 3043.

At the show cause hearing, Blitz introduced 14 exhibits representing each phase of Blitz's fact-finding efforts around flame arrestors and explosion suppression materials—all of the exhibits were documents produced by Blitz to Plaintiff in the *Green* case.  S.C. Hr'g Tr. at 10:11 – 13:13.  To further establish that it had not willfully or in bad faith missed documents, Blitz identified defense-favorable documents only later located and produced in the pending cases, and not produced in *Green*.  USCA5 2970.  Plaintiff then sought to cross-examine Mr. Chrisco with ten documents produced in subsequent cases.[5]  The District Court limited its discussion to three of them:

**Plaintiff's Exhibit 1—The Rocky Flick Wish List**.

After the *Green* trial, Blitz uncovered a handwritten memorandum from

---

[5] Four of the documents were subject to privilege and/or protection claims by Blitz, having been inadvertently produced in the pending litigation.  *See infra*, note 8.

Rocky [Flick] to Larry [Chrisco] re: "My Wish List." The Wish List was located in a file labeled "C.A.R.B. 8/5/2003 Meeting." The majority of the memorandum discussed machine purchases related to manufacture of an emission-resistant consumer gas can for sale in California. S.C. Hr'g Tr. at 16:14 – 17:11. Located in a 160-page file, there were three lines in a four page handwritten document that read:

> Develop & introduce device to eliminate flashback from a flame source. Water heater incidents should be the test case for this. Once this is developed we should advocate the device be standardized under ASTM regulations or laws (2 years).

S.C. Hr'g Pltf. Exh. 1. Mr. Chrisco does not remember seeing that file when he was collecting documents. S.C. Hr'g Tr. at 26:1 – 8. Even if he had come across the file, he might not have looked in it because it was labeled with reference to the California Air Resources Board ("CARB"). CARB regulates emissions in California. The *Green* container was sold in Texas and was a self-venting model, a wholly different design than the CARB-style. CARB and CARB-style containers had no relevancy to the *Green* claims. *Id.* at 34:6 – 13. Mr. Chrisco testified: "Had I looked through that [folder] and saw that wish list, I would have pulled that wish list out and I would have turned that list over to counsel because it had flame arrestor stuff on it. That's what I would have done. . . I missed it. . . I just missed it." *Id.* at 34:14 – 22.

### Exhibit 4—Email Regarding Flame Arrestors in the Marine Industry

Plaintiff's Exhibit 4 was an email related to the use of flame arrestors in the marine industry.  The email was originally sent from Douglas Hughes to a Blitz employee, Chuck Craig, and forwarded on August 8, 2005 to other Blitz employees, including Mr. Chrisco.  The email innocuously states:

> I've been in meetings and travelling all day, so I apologize, I haven't had a chance to call you back earlier today.  As far as your questions for the flame arrester, the marine industry uses them in all the boat tanks, so the technology and testing has to be in place today.  I am going to look through some of the Coast Guard test procedures and see if I can't come up with something.

S.C. Hr'g Pltf. Exh. 4.  Mr. Chrisco did not locate this in his email search.  Mr. Chrisco testified:  "If I had it [Plaintiff's Exhibit 4] in my possession, I would have turned it over.  If—if it wasn't a part of that, then I just would have missed it in the search."  S.C. Hr'g Tr. at 39:16 – 18.

### Exhibit 10—Development Team Meeting

On February 8, 2007, Mr. Chrisco attended a meeting with other key Blitz employees.  Plaintiff's Exhibit 10 was either an agenda for or minutes of that meeting and discusses a variety of different topics, including Objectives, Goals, Strategies, and Measures (OGSM) at Blitz.  One reads: "understand and embrace high risk category exposure."  Another: "[e]xit gas cans for 3-5 years, develop other business, and re-enter w/lower liability (?) and safer CARB product.  Exit

selective markets until awareness is higher." Blitz did not, however, "exit gas cans for 3-5 years." Blitz remained in the market. It devoted resources to raising consumer awareness and, moreover, supported an ASTM Task Force on flame arrestors. At the hearing, Mr. Chrisco testified: "Again, if I found this document in my search, it would have been turned over. That's -- that's just the honest answer to that. If I found it, I would have turned it over." S.C. Hr'g Tr. at 47:22 – 25.

The Court also found that Blitz had destroyed relevant electronic documents. The Court inferred that relevant electronic documents would have been destroyed due to Blitz's failure to institute a written litigation hold and because IT personnel sent messages to employees asking them to reduce their email volume due to server size limitations without mentioning litigation retention obligations. USCA5 3040 – 3042.

The Court ordered Blitz to pay $750,000 in civil contempt sanctions to the Plaintiff. The Court additionally ordered that Blitz had thirty (30) days to furnish its Order to every plaintiff in cases against Blitz pending in other jurisdictions. At the end of that time period, if Blitz certified with the Court that it had complied with the Order, $500,000 of the sanction would be extinguished. Finally, for the next five years, Blitz was ordered that in every new lawsuit that it participates in as a party, whether plaintiff, defendant, or in another official capacity, it must file the

Order with its first pleading in that particular court.  USCA5 3046 – 3047.  The

Order is stayed pending appeal. USCA5 3057.

I.    Other Courts Found the Record Insufficient to Support Imposition of Sanctions.

Plaintiffs in several other cases filed Motions for Sanctions against Blitz

alleging, among other things, intentional withholding of documents, document

destruction, and willful disobedience of discovery orders.  The *Green* Court

references these other cases in its Sanction Order, but misstates the courts' rulings

in *Gaddy* and *Zecaida*[6] and never mentions any of the many rulings in Blitz's favor

---

[6] ***Gaddy v. Blitz U.S.A., Inc.*, No. 2:09-cv-0052 (E.D. Tex. Marshall Div.) (J., Folsom)**: The *Green* Sanctions Order included among its findings that "[t]he Court in *Gaddy* and *Zecaida* sanctioned Blitz by allowing evidence in those cases regarding Blitz's discovery abuses and allowing a jury instruction that Blitz failed its duties of discovery." USCA5 3030.  In so holding, the *Green* court misstates the *Gaddy* and *Zecaida* orders.  In *Gaddy*, Chief Judge Folsom <u>modified</u> Magistrate Judge Everingham's Report and Recommendation.  *Id.* at 3165 – 3174. Judge Folsom found the Magistrate Judge had "declined to find 'bad faith' as a matter of law." *Id.* at 3169.  "An adverse inference instruction requires either a finding of bad faith as a matter of law or an instruction that the jury must find bad faith before it can draw any adverse inference." *Id.* at 3170.  The district court rejected plaintiffs' contention that mere willfulness was sufficient for such an instruction in the Fifth Circuit. *Id.* at 3171 – 3172 (collecting precedent).  The district court held: "[T]he Court will not necessarily instruct the jury that Defendant failed to preserve evidence, that this failure violated the rules applicable to the discovery process, or that this failure has resulted in the loss of relevant, material evidence.  Instead, the Court will await the presentation of evidence at trial and then, at that time, can determine what related jury instructions, if any, are appropriate." *Id.*  at 3173.  The *Gaddy* case was resolved by the parties before trial.

***Zecaida v. Blitz U.S.A., Inc.*, No. 6:09-cv-0283 (E.D. Tex., Tyler Div.) (J., Schneider)**: In *Zecaida*, Magistrate Judge Everingham also entered a Report and Recommendation speculating that relevant documents were destroyed but adding: "It must be remembered that many Blitz employees—including those in upper management—have testified that even in the absence of a formal litigation hold, they knew they needed to retain documents relevant to gas can litigation. Likewise, the record, as a whole, does not support a finding at this stage that any destruction of documents was done in bad faith. The evidence on these issues is contested." USCA5 3107. Blitz objected to the Report and Recommendation to the extent it concluded relevant documents were destroyed.  That Motion and the Report and Recommendation remained pending when the case was resolved.  USCA5 2284 – 2296.

by other federal and state courts.    USCA5 3030.    No other court has found

sufficient evidence in the record to sanction Blitz.[7]

## VIII.

## SUMMARY OF ARGUMENT

Plaintiff settled her lawsuit and released Blitz from any current or future

claims, known or unknown.    Plaintiff did not seek to set aside the settlement

agreement as fraudulently induced.    The District Court erred by ignoring the terms

of the Settlement Agreement and by issuing civil sanctions after settlement of the

case, especially where Plaintiff raised this exact issue in a Motion for Sanctions

before trial but elected to withdraw the Motion before it was heard.

---

[7] *Calder v. Blitz U.S.A., Inc.*, **No. 2:07-cv-00387 (D. Utah)**: In Utah Federal Court, Magistrate Judge Paul M. Warner denied two **different** motion for sanctions.  USCA5 2499, 2502.  Both decisions were affirmed and adopted by Chief Judge Tena Campbell.  USCA5 *2734*, 3198. Document destruction and discovery allegations were excluded at trial.  *Calder v. Blitz U.S.A., Inc.*, No. 2:07-cv-00387 (D. Utah Oct. 28, 2010) (ECF No. 416).

*Donald Thornton v. Blitz U.S.A., Inc.*, **No. 5:09-cv-00003 (S.D. Ga.):** Plaintiff Thornton filed a Motion for Sanctions against Blitz virtually identical to Plaintiff Green's.  Thornton alleged that he was prejudiced by Blitz's failure to issue a written litigation hold and that Blitz destroyed documents related to flame arrester designs.  Judge Lisa Wood rejected the plaintiff's claim, finding his document destruction allegations unsubstantiated, and noting that "[t]ime and time again, Plaintiff alleges wrongdoing but is unable to produce any convincing evidence in support. As a result, the Court finds that sanctions are inappropriate as to Blitz's alleged failure to implement a litigation hold."  USCA5 3182.  Judge Wood rejected plaintiff's circular argument that the absence of documents one would expect to see associated with a flame arrestor design project was evidence that such documents had been destroyed, noting that "Plaintiff unjustifiably assumes that there, in fact, was a flame arrester design project. . . . Plaintiff simply ignores the basic fact that he has not shown that a flame arrester [design] project existed at all."  *Id.* at 3187 – 3188.

*Beadore v. Stewart's Shops Corp.*, **RJI No. 45-1-2006-1470, Index No. 2006-2122 (Sup. Ct. N.Y., Saratoga Co.):** In New York State Court, yet another motion for sanctions based upon alleged spoliation was denied by Honorable Supreme Court Judge Thomas D. Nolan, Jr.  USCA5 3209 – 3213.

Prior to 2009, Blitz had individual employees search for documents to satisfy its discovery obligations. While Blitz may not have used the most "cutting-edge" discovery methods in *Green*, there was no evidence in the record that it conducted discovery in a manner deliberately intended to abuse the rights of Plaintiff such that sanctions could be imposed. Even today, the individual custodian document collection employed by Blitz prior to 2009 is not an obsolete method for litigants to satisfy their discovery obligations, much less a method meriting sanction. With respect to e-discovery, there is no difference between an individual custodian searching his or her own files and email for documents and a third party or IT administrator individually logging into a user's account and conducting such a search. Blitz's computer system, before *Green*, did not allow it to conduct companywide electronic searches. Instead, Blitz's computer system required individuals to search their respective electronic documents. From individual searches, Blitz produced over 4,000 pages of emails and attachments to Plaintiff. As Mr. Chrisco testified at the show cause hearing, despite his best efforts to locate all responsive documents, he simply missed some things.

Likewise, to conduct a "reasonable" search, a litigant is not required to collect and image all its electronic assets and conduct key word searches. A party's failure to conduct cutting-edge e-discovery cannot constitute willful violation of that party's discovery obligations. Further, to the extent a court's

discovery order requires a party to produce "all relevant documents," principles of reasonableness still govern; otherwise, a party would be in violation of the court's order when additional documents are inevitably, subsequently located in protracted litigation.

In addition to the Court's finding that Blitz willfully violated its discovery obligations by not locating and producing a handful of documents in *Green*, the Court also found that Blitz destroyed relevant documents. The Court's conclusion that Blitz destroyed relevant documents is without any support in the record. The Court relied on two facts to conclude that relevant documents were destroyed: the absence of a written litigation hold policy, and directives from Blitz's IT department to all Blitz users to free up email server space by deleting or archiving unnecessary email. In various Blitz cases, plaintiffs have conducted over one hundred depositions of twenty-three current and former employees. Plaintiffs have subpoenaed myriad third parties with whom Blitz did business. Despite this drain-the-lake discovery, Plaintiff Green is unable to point to one document or one sentence of testimony where a Blitz employee destroyed a relevant document willfully or in bad faith. In the Fifth Circuit, failure to issue a litigation hold is not per se evidence that relevant evidence was destroyed. A moving party must identify specific, relevant documents that are no longer available on the basis of testimony or other evidence. Plaintiff did not satisfy this burden.

28

Further, other state and federal courts have analyzed the same or similar record on which Plaintiff Green brought her sanctions motion. Every other court (and even a magistrate judge and judge within the same District), found the record insufficient to support the conclusion that Blitz engaged in sanctionable conduct.

Finally, even if a District Court retains jurisdiction over a settled case to impose sanctions designed to enforce its own rules, even after that court no longer has jurisdiction over the substance of the case, it does not have authority to require a litigant to file its Order in closed, pending, and future cases in other jurisdictions. This penalty is excessive and unnecessary to effectuate the permissible purposes of sanctions, especially when the documents at issue were ultimately located and produced by Blitz.

IX.

ARGUMENT

**Standard of Review**

The imposition of sanctions is reviewed for abuse of discretion. *E.g.*, *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999). A court will have abused its discretion if its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of evidence. *Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 208 (5th Cir. 1998). "[T]he threshold for the use of inherent power sanctions is high." *Elliott v. Tilton*, 64 F.3d 213, 217 (5th Cir. 1995). Thus, "[t]he Fifth

Circuit's review is not perfunctory." *Crowe v. Smith*, 151 F.3d 217, 226 (5th Cir. 1998). As the Supreme Court has cautioned, the inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991). Whether settlement of a case resolves all elements of the case, including any right to seek civil sanctions, is a question of law reviewed *de novo*. *See Flight Eng'rs Int'l Ass'n, EAL Chapter v. Eastern Air Lines, Inc.*, 301 F.2d 756, 758 – 59 (5th Cir. 1962) (by implication).

A.    The Settlement Agreement and Release Language Precluded the District Court From Awarding Monetary Sanctions to Plaintiff.

In general, a <u>civil</u> sanction occurs <u>prior</u> to judgment or settlement and compensates a complainant for loss or is designed to coerce compliance with a court order. *Andrews v. Holloway,* 256 F.R.D. 136 (D.N.J. 2009) (quoting *McDonald's Corp. v. Victory Inv.,* 727 F.2d 82, 87 (3rd Cir. 1984)). On the other hand, a *criminal* sanction punishes and vindicates the court's authority and must be limited to situations involving willful disobedience or a specific intent to consciously disregard a specific, clear and definite court order. *Buffington v. Baltimore Cnty.,* 913 F.2d 113, 133 (3d Cir. 1990); 18 U.S.C. § 401; *Ashcraft v. Conoco, Inc.,* 218 F3d 288, 295 (4th Cir. 2000); *Waste Conversion, Inc. v. Rollins Envtl. Servs., Inc.,* 893 F2d 605, 610 (3d Cir. 1990). A separate prosecutor must be

appointed and the "beyond a reasonable doubt" burden of proof applies. *Bradley v. American Household, Inc.,* 378 F.3d 373, 379 (4th Cir. 2004) (citations omitted).

When sanctions are sought after settlement, a court must carefully consider the procedural status of the case. In certain circumstances, a court's jurisdiction to consider sanctions continues after judgment, dismissal, or settlement. *See Fleming & Assocs v. Newby & Tittle,* 529 F.3d 631 (5th Cir. 2008). In *Fleming,* the trial court issued a sanction order prior to settlement of the case and then quantified the amount of the monetary sanction subsequent to settlement of the case. In this situation, the Fifth Circuit held that the trial court's sanction order itself, entered prior to settlement, could stand; the monetary sanction, however, was reversed, with the court recognizing that the parties' settlement agreement precluded further compensation to the plaintiff. *Id.* at 641.

Similarly, in *Bradley,* 378 F.3d at 380 – 81, the trial court reopened a case following a settlement and issued sanctions against the defendant, in part, for failing to comply with the trial court's discovery order entered prior to the settlement agreement. The Fourth Circuit overturned the portion of the decision related to noncompliance with the trial court's previous discovery order, concluding that the trial court retained jurisdiction to enforce orders, which "sprang directly from the terms of a negotiated settlement." However, the sanction order as it related to noncompliance with the discovery order was overturned. The

Fourth Circuit held that such a sanction was criminal in nature and was not accompanied by appropriate due process protection. Further, even if monetary sanctions were considered to be civil, they were invalid as they were "irreconcilably at odds with the negotiated Settlement Agreement." *Id.* at 381. The court noted that "settlement agreements too are part of the dispute resolution process to which courts themselves owe a measure of respect." *Id.*

Courts have and must exercise continuing or residual jurisdiction in certain situations. *See ESN, LLC v. CiscoSystems, Inc.,* 685 F. Supp. 2d 631 (E.D. Tex. 2009) (a court may exercise jurisdiction after a motion to dismiss for lack of subject matter jurisdiction is granted), aff'd in part by, 397 F. App'x 630 (Fed. Cir. 2010). However, a court's continuing or residual jurisdiction is limited, particularly when collateral issues related to discovery arise long after judgment or settlement. In particular, a court cannot issue sanctions that compensate a plaintiff who has already settled with the defendant. *Id.*

As stated above, the parties reached a settlement, Blitz paid Plaintiff the "low" (a significant amount of money), and Plaintiff signed and delivered a full release. Plaintiff released Blitz and its agents from any and all claims and damages, both compensatory and punitive, whether direct or indirect, past and future. Plaintiff agreed that Blitz was paying the money to "prevent the assertion of any claim" by anyone. [ECF No. 209-9 at 7] Plaintiff agreed to indemnify and

hold harmless Blitz from any further claim, action, costs and other expenses. *Id.* Further, Plaintiff agreed she did not rely on any representations by any other party or entity in entering the agreement. *Id.* at 3.

Under these facts and the precedent, Plaintiff has released all claims for a civil sanction, particularly any type of money payment to Plaintiff. Plaintiff expressly did not rely on any representation made by Blitz or its counsel certifying that discovery obligations had been met. Indeed, Plaintiff had earlier filed and withdrew a Motion to Compel and for Sanctions based on the limited documents on flame arrestors in Blitz's production, the very subject of her post-settlement Motion for Sanctions. [ECF Nos. 59, 70] Unlike those cases where a court found continuing jurisdiction to impose sanctions based upon a pre-settlement sanction order or under a settlement agreement where the defendant accepted some continuing obligation, the facts of this case are that the settlement was final and precluded imposition of civil sanctions against Blitz.

The District Court's decision misconstrues *Fleming* and related precedent. Those cases reflect that settlement agreements are an important and integral part of the litigation process. If the agreements are obtained or tainted by fraud, the complaining party may return the settlement funds and pursue damages. *Senigaur v. Ford Motor Co.*, 222 F. Supp. 2d 829 (E.D. Tex. 2002). In particular, if a settling plaintiff later believes a defendant's failure to produce documents in

pretrial discovery tainted the settlement agreement, the plaintiff may return the settlement money and then seek further compensation. *Dempsey v. Associated Aviation Underwriters*, 141 F.R.D. 248 (E.D. Pa. 1992), aff'd, 977 F.2d 567 (3d Cir. 1992).

Accepting the District Court's view of the law will improperly allow a party to settle the case, sidestep Rule 60, and make claims even years after the settlement. As a practical matter, no settled case could ever be considered final. Every lawyer on either side of the docket would have an ongoing duty to monitor discovery developments suggesting that discovery in the old, closed files was inaccurate or incomplete. Such a duty cannot exist; otherwise, no case would be "over" when it settles. This compromising of the permanency of final judgments and settlements cannot stand, and the *Green* Court's decision should be overturned.

B.     Blitz's Discovery Efforts Were Not Sanctionable.

Like any litigant, Blitz can only use reasonable efforts in conducting discovery. Those efforts are circumscribed by inevitable limitations on time, resources, and even serendipity. Confusion and uncertainty about the e-discovery obligations of civil litigants are at their fulcrum. "'[O]ur discovery system is broken' . . . '[e]lectronic discovery, in particular, needs a serious overhaul." Beisner, John H., *Discovering A Better Way: The Need for Effective Civil Litigation Reform*, 60 Duke L.J. 547, 551 (Dec. 2010) (internal citations omitted).

"One expert estimates the cost of producing a single electronic document to be as high as $4." *Id.* at 566. "The rising costs associated with electronic discovery threaten to drive all but the largest cases out of the system." *Id.* at 567. "[I]n low-value cases, the costs of electronic discovery could dominate the underlying stakes in dispute." *Id.* (internal quotations omitted).

> Spoliation of evidence--particularly of electronically stored information--has assumed a level of importance in litigation that raises grave concerns. Spoliation allegations and sanctions motions distract from the merits of a case, add costs to discovery, and delay resolution. The frequency of spoliation allegations may lead to decisions about preservation based more on fear of potential future sanctions than on reasonable need for information.

*Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 598 (S.D. Tex. 2010). Even the United States Supreme Court has taken note: "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching" the summary judgment phase. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "At some point, the adversary system needs to say 'enough is enough' and recognize that the costs of seeking *every* relevant piece of discovery is not reasonable." *Cognex Corp. v. Electro Scientific Industries, Inc.*, No. 01-CV-10287, 2002 WL 32309413, at *5 (D. Mass. Jul. 2, 2002).

Despite a growing awareness that e-discovery cannot perfect the discovery process and may even sometimes stifle the pursuit of justice, the *Green* Court wrongly viewed Blitz's individualized custodian-based collection method with

disdain.  In fact, the *Green* Sanction Order is already being touted for the proposition that manual collection efforts, though clearly appropriate in earlier periods of practice, expose litigants to too much risk to remain a viable method for conducting discovery today.  *See* Gonowski, Dean, *Electronic Discovery Cases You Must Know* (May 10, 2011).

Rule 26, in contrast, requires a party to make a <u>reasonable effort</u> to search for and produce documents in response to discovery requests.  FED. R. CIV. P. 26(g) (emphasis added).  Rule 26 provides for proportionality: the scope of discovery is limited by "the burden or expense of the proposed discovery, where such burden or expense outweighs its likely benefit," taking into account "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  FED. R. CIV. P. 26(b)(2)(C)(iii).  The Rule does not dictate a particular collection method, only that reasonable effort is made.

Under the Federal Rules of Civil Procedure, relevancy is only a threshold requirement, after which "counsel must also make a common sense determination" about whether the discovery is justified by its burdens.  *In re Convergent Tech. Sec. Litig.*, 108 F.R.D. 328, 331 (N. D. Cal. 1985) (excerpted in Wright & Miller, 8 Fed. Prac. & Proc. § 2008.1) (3d ed.).  "Those [1983] amendments formally interred any argument that discovery should be a free form exercise conducted in a

free for all spirit. Discovery is not now and never was free. Discovery is expensive." *Id.*

Because the Federal Rules of Civil Procedure do not dictate a particular collection method (for example, key word v. custodial searches) or a particular outcome (for example, production of <u>all</u> relevant documents or even most relevant documents), a court's inquiry into whether a party's discovery efforts were so deficient as to merit imposition of sanctions instead hinges on culpability. The standard in this Circuit for evaluating a party's discovery efforts, and any deficiencies, whether under the court's inherent authority or Rule 37, turns on whether the conduct was willful or in bad faith. *In re United Markets Int'l, Inc.,* 24 F.3d 650, 654 (5th Cir. 1994); *Dorsey v. Academy Moving & Storage, Inc.*, 423 F.2d 858, 860 (5th Cir. 1970) (Rule 37 sanctions are "predicated on the presence of such factors as willful disobedience, gross indifference to the rights of the adverse party, deliberate callousness, or gross negligence.").

For purposes of sanctions analysis, willfulness is generally characterized by knowing, intentional violation of the party's discovery obligations with the ability to comply and awareness that one is not complying. *See United States v. $49,000 Currency,* 330 F.3d 371, 376 (5th Cir. 2003). *$49,000 Currency* was a drug-money forfeiture case. The government served a request for discovery and interrogatories on December 12, 2000. After multiple promises from claimants'

counsel that formal disclosures, answers to interrogatories, and requested documents were "on the way," the government's counsel agreed to travel to Baton Rouge on February 17, 2001 to personally retrieve the discovery. However, upon review, there were no disclosures, and the answers to interrogatories and production requests were incomplete. The government received no follow-up from claimants and filed a motion to compel. Claimants were ordered to produce outstanding discovery by June 4, 2001. On June 20, 2001, having still received nothing further from claimants, the government notified claimants' counsel that the government planned to file a motion to strike claimants' pleadings and enter judgment for the government, if claimants failed to comply with the court's order to compel by June 29, 2001. On July 2, 2001, claimants filed a motion to dismiss and simultaneously produced documents that, however, were still incomplete and insufficient to comply with the court's order. Claimants did not dispute that their conduct was willful.

The distinctions between various levels of culpable conduct have been well-parsed out in another recent decision, *Orbit One Commc'ns, Inc. v. Numerex Corporation*:

> Negligence, or "culpable carelessness," is "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation[.]" *Black's Law Dictionary* 846 (Bryan A. Garner ed., abridged 7th ed., West 2000). Negligence is contrasted

38

with "conduct that is intentionally, wantonly, or willfully disregardful
of others' rights." *Id.*

271 F.R.D. 429, 529 (S.D.N.Y. 2010).  "Willfulness is equivalent to intentional,

purposeful, or deliberate conduct." *Id.* at 530 (quoting *Buckley v. Mukasey,* 538

F.3d 306, 323 (4th Cir. 2008)).  *See also Batson v. Neal Spelce Assocs., Inc.*, 765

F.2d 511, 514 (5th Cir. 1985) ("[D]ismissal is authorized only when the failure to

comply with the court's order results from willfulness or bad faith, <u>and not from</u>

<u>the inability to comply</u>. . . .  Finally, dismissal may be inappropriate. . . when a

party's simple negligence is grounded in confusion or sincere misunderstanding of

the court's orders.") (emphasis added).

Contrary to long-standing Fifth Circuit precedent, however, the *Green* Court

imposed extremely severe sanctions, not because Blitz intentionally hid or

destroyed documents, but because Blitz utilized a document collection method that

the Court determined could have been better.  Specifically, the *Green* Court

severely sanctioned Blitz because (1) Blitz failed to locate every relevant document

prior to the *Green* trial, and (2) Blitz relied on its individual employees to search

for paper and electronic documents.  The District Court's finding that Blitz's

conduct was "willful" in character is clearly erroneous.  Its view of the law is in

error.  The decision must be reversed.

1.    The *Green* Court Abused Its Discretion in Severely Sanctioning Blitz; Parties Are Obligated to Make Reasonable, Not Perfect, Efforts.

That the District Court's finding of willfulness is clearly erroneous is apparent by the nearly impossible bar it sets for a party producing documents. First, the decision finds a party's conduct to be "willful" and meriting imposition of sanctions if it later produces documents either missed or located through cutting-edge e-discovery methods.   Throughout the period in question, Mr. Chrisco, the man who either directed or conducted all of Blitz's investigations into explosion suppression materials, including flame arrestors, went about collecting Blitz documents for production in litigation:

> I went to the individuals that I talked about earlier.  I said, "I want anything, whether it's e-mails, electronic, whether it's a letter, any documents you have, I don't care how they were generated, I needed those documents to look at for the discovery process around the topics we discussed."

S.C. Hr'g Tr. at 78:21 – 79:1.

> I asked all the people that I work with and – to take a look at all of the forms of communication, whether that's e-mail, whether that's letters, whatever they may have, I asked them to turn that over, yes.

*Id.* at 51:15 – 20.  Although he admitted, humbly, jokingly, that he was "about as computer illiterate as they get," he "checked all sources, e-mails," he "<u>searched everything, e-mails, electronics.  I looked at everything where I thought documents could probably be."</u>  *Id.* at 37:5 – 14.  Mr. Jackson, Blitz's controller, worked with

Mr. Chrisco on collecting documents during the early to mid-2000s and described

that documents were likely produced from a mix of media and print sources and

that, due to the volume requested, lots of other people were involved:

> I—I feel like—I feel like we did a good job.  Again, we –we didn't
> just have—we didn't just assign that to somebody and say "Go pull
> these documents."  We had a number of people that were—that were
> integral people in those various areas and we said "We need you to"—
> "to go find all the documents for these"—you know "various things."

USCA5 *2625 – 2626*. "So we'd just have to go back to the proper people that

would . . . . be best able to answer that document request." USCA5 *2626 – 2627*.

Within 45 days of the Court's order requiring Blitz to produce all relevant

documents in *Green*, the parties reached an agreement that the results of these

earlier searches would be used here.  USCA5 176 – 177.  Blitz supplemented its

production at least ten times thereafter.  USCA5 *2788*.  Contrary to the Court's

clearly erroneous findings, Blitz did search for and produce electronic documents,

including "flame arrestor" documents, enter documents on a privilege log,[8] and

revisit its discovery obligations throughout the course of the case.  Blitz's lack of

---

[8] Rule 26 requires that documents withheld from production be logged.  FED. R. CIV. P. 26(b)(5).
From a purely practical standpoint, documents cannot be logged when they have not been
located.  Plaintiff's Show Cause Hearing Exhibits 5, 6, 9, and 11 did not appear on Blitz's
privilege log at the time of the *Green* trial because they were not located or collected prior to that
trial.  USCA5 2939 – 2942, 2999 – 3000 (Affidavit of James Scott Murphy, Esq.)]  The Court
had also earlier received briefing on another set of documents related to Blitz's work with
Dunbar Engineering.  The Magistrate Judge found Plaintiff had actual knowledge of the Dunbar
work. USCA5 *2782*.  Accordingly, Blitz's failure to produce these documents did not prejudice
Plaintiff. To the extent Blitz's privilege log was any basis for the Court's imposition of
sanctions, the Court abused its discretion and its decision was clearly contrary to law.

willful or deliberate intent to disregard Plaintiff's rights is readily apparent in comparing Blitz's behavior to precedent. *See, e.g., U.S. v. $49,000 Currency,* 330 F.3d 371.

In protracted litigation, documents are inevitably located that were not discovered and produced in earlier cases. Following the *Green* trial, and prompted by expanding issues in the litigation, Blitz spent about $1,000,000 in document production efforts. During those efforts, Blitz found documents which would have been discoverable in the *Green* case, but were not located or produced in *Green*. At the show cause hearing, Plaintiff produced ten documents that she claimed were intentionally withheld from the *Green* production.[9]  In its Sanction Order, the *Green* Court focused on three documents: a handwritten four-page memo from Rocky Flick to Larry Chrisco, (2) the Marine Flame Arrestor email, and (3) minutes from a Development Team Meeting dated February 8, 2007. There is no evidence that Blitz intentionally withheld any of these documents. Further, that such documents exist, were not destroyed, and were produced, establishes that Blitz did not act willfully, in bad faith, or undertake any efforts to destroy the subject documents. Rather, in the words of Larry Chrisco, "I just missed them."

---

[9] At least one of the documents complained of was created a year after the *Green* trial. USCA5 2978. Other documents introduced by Plaintiff at the show cause hearing were merely calendar entries or meeting reminders. *Id.*

To the extent a court's discovery order requires a party to produce "all relevant documents" such that anything short of perfection may constitute a violation of the court's order, that discovery order is inconsistent with Federal Rule of Civil Procedure 26 by failing to incorporate principles of reasonableness. Reasonableness and proportionality are necessary components of the court's analysis if sanctions are to be imposed. *See Rimkus*, 688 F. Supp. 2d at 613.

2.     Blitz Did Not Intentionally or Deliberately Disregard Plaintiff's Rights—a Prerequisite to Impose *Green*-Like Sanctions.

The District Court recognized in the Sanction Order that "severe sanctions should be confined to instances of 'bad faith or willful abuse of the judicial process.'" USCA5 3065. However, the Green Court failed to recognize this limitation on its inherent powers in entering the Sanction Order.

### i.     The Court Declined to Evaluate Blitz's Culpability.

A party cannot be sanctioned when it was not deliberately violating a court order or disregarding an opposing party's rights to discovery. The District Court erred when it expressly declined to evaluate the culpability of Blitz's mental state, through its employees: "That Larry Crisco [sic], Blitz's employee in charge of gathering discovery, did not know how to search for electronic documents is immaterial." The Court continued, "Blitz had an obligation to conduct such a search. Perhaps Blitz should not appoint someone to coordinate discovery who is

admittedly as "computer literate--illiterate as they get. Or, alternatively, Mr. Crisco [sic] could have at least inquired with the Blitz IT Department regarding a search for electronic documents, which he admittedly did not do." USCA5 3043.

In the Fifth Circuit, though, even gross negligence is an insufficient basis to impose sanctions. *Rimkus*, 688 F. Supp. 2d at 615.[10]   But the District Court disregarded the Fifth Circuit's definition of willfulness, extending its decision to parties that *perhaps could have* done something more to better satisfy their discovery obligations.   The Court also does so by brushing aside as "immaterial" that a party did *not know how* to do what more the Court would require.   That there is simply more that could have been done and the party's lack of knowledge of its supposed violation **are** "material" under the law here—they indicate that conduct is less culpable than that required to impose sanctions, that the conduct was not willful.   Compare, for example, *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 242 F.R.D. 362, 360 – 370, 375 – 380 (E.D. Tex. 2007).   Affirmed in part and reversed in part on appeal by this Circuit, to determine the withholding party's willfulness or bad faith, the District Court considered the implausible explanations, reasoning, credibility, contradictions, and inconsistency in the testimony of the withholding party, and an email indicating the party's intent to try to withhold the subject

---

[10] Also instructive here, the *Orbit* decision goes on to collect cases demonstrating how courts often combine their analysis of willfulness and bad faith. 271 F.R.D. 429, 530 – 531 (S.D.N.Y. 2010).

records. *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 560 F.3d 1291, 1299 – 1300 (5th Cir. 2009).   The District Court below conducted no inquiry into culpability, the decision contains no findings along the lines of those in *ClearValue*, and the record wholly lacks evidence of culpable mental state.

Mr. Chrisco testified that he worked hard and took seriously his searches for relevant documents.  S.C. Hr'g Tr. at 29:4 –11.  At his retirement from Blitz, he felt extremely confident that documents in any way relevant to flame arrestor litigation had been collected and produced. *Id.* Blitz appointed him to this task because he was in the best position to identify potentially relevant documents due to his dealings with the subject matter.  *Id.* at 22:18 – 24.   That there were additional actions that could have been taken does not constitute intentional, deliberate, or purposeful misconduct as a matter of law.  This error of law and clear error of fact warrants reversal of the District Court's decision.

>   ii.    **Blitz's Individual Custodian Collection Was Not "Willful" Violation of a Party's Discovery Obligations, Meriting Imposition of Sanctions**.

Rather than analyze Blitz's culpability, the *Green* decision finds a party's discovery deficiencies "willful" if its methods of individual custodian collection fail to comply with some hither-to-unknown, unpublished standards.   As set forth above, no authorities dictate a particular collection method, and certainly did not

do so at the time in question in the *Green* decision, 2004 to 2006.  The e-discovery subparts of Rule 26 did not even appear until the 2006 amendments.

In a recent case in the United States District Court for the District of New Jersey, for example, *Ford Motor Co. v. Edgewood Properties, Inc*, 257 F.R.D. 418, 427 (D.N.J. 2009), Edgewood complained about Ford's document collection process, arguing there were missing documents related to certain issues in the case, and seeking to have a third-party vendor perform a key word search of electronically stored records from certain custodians.   The court rejected the argument, citing the *Sedona Principles*' statement that "[a]bsen[t] agreement, a [responding] party has the presumption, under Sedona Principle 6, that it is in the best position to choose an appropriate method of searching and culling data."   The court found that, absent agreement on the method by which Ford was to search for documents, Ford was in the best position to know how documents had been produced and were maintained.   It found that "reinventing the wheel," by granting Edgewood's request, which would essentially have been a do-over of the document collection efforts Ford had undertaken, would be unduly burdensome to Ford.  The court further found that Edgewood's requested relief would be improper given that it had not shown any indicia of bad faith on Ford's part. *Id.* at 428.

More acute is that the District Court here was also clearly mistaken on the record about what more could or should have been done.   Until over a year after

the *Green* case, it was not possible to run word searches across Blitz's email server. USCA5 2981 – 2984.  Rather, searches for email had to be conducted by each individual user or by someone logging in as the user.  *Id.* at 2985 – 2987. Likewise, until over a year after the *Green* case, there was no way to electronically search for words within the content of Blitz documents because Windows Server 2003, the system then in place at Blitz, did not have that capability.  *Id.*  Any key word search would only search the title of the documents.  *Id.*  Blitz therefore relied on individual custodians searching their documents by subject.  The *Green* Court was critical of Blitz's failure to conduct key word searches across its electronic assets, notwithstanding the relative inability for it to do so.

But the *Green* Court also underestimates the extent to which system wide e-discovery is as susceptible to imperfection as individual custodian collection.  The Court attempted to account for the technology Blitz had available by suggesting that IT administrators should have logged into individual user's accounts and conducted key word searches.  But this approach is no different than the method Blitz actually employed: there is no difference between an individual custodian searching his or her email for documents and an IT administrator individually logging into and searching the user's email.

The District Court's suggestion, for example, to search individual user's email for the term "flame arrestor," would not have yielded two of the three

documents at issue in the Order.  **Exhibit 1** was a handwritten hard copy document that nowhere mentions "flame arrestors."  **Exhibit 10**, likewise, nowhere uses those words.  As one court has jested:

> . . . whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. Given this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread. This topic is clearly beyond the ken of a layman and requires that any such conclusion be based on evidence that, for example, meets the criteria of Rule 702 of the Federal Rules of Evidence.

*United States v. O'Keefe*, 537 F. Supp. 2d 14, 24 (D.D.C. 2008).

The District Court also clearly erred in its findings about Blitz failing to more generally involve its IT department in searching.  Mr. Chrisco did testify that he did not have conversations with Mr. Hale specific to information technology and litigation; instead, he testified though, most of his conversations were with Thomas Jackson.  S.C. Hr'g Tr. at 85:6 – 13.  What the Court overlooked was that Mr. Jackson was Blitz's controller through 2006, and was primarily responsible for maintenance and development of its computer system. [ECF No. 233-7 (Affidavit of Thomas Jackson)]  Mr. Jackson was Mr. Hale's one-time superior and Mr. Chrisco's co-vice president.  He earlier shared document collection responsibilities with Mr. Chrisco.  Thus, the finding that Blitz failed to involve its IT department in document collection is clearly erroneous, irrespective of the fact that such

collaboration would have offered little to no value over the individual custodian collection method Blitz employed, due to its technological constraints at the time. The District Court's decision should be reversed because it runs afoul of Fifth Circuit standards requiring willful conduct for sanctions to be imposed, but is also clearly mistaken on the record about what more could or should have been done.

C.     The Conclusion that Blitz Destroyed Relevant Evidence Is Without Any Support in the Record and Is Reached without Applying the Relevant Standards of Law.

The *Green* Court found that Blitz destroyed relevant documents. It made this finding without any evidence. Instead, the *Green* Court assumed that relevant documents were destroyed because Blitz failed to issue a formal written litigation hold until 2009 and because Blitz's IT department sent e-mails to all Blitz users urging them to archive or delete unnecessary e-mails to free-up server space.

1.     Lack of Formal Written Litigation Hold Is <u>Not</u> Evidence That Documents Were Destroyed.

Blitz began ongoing collection and retention of documents relevant to exploding gas can allegations in 2002. In its flame arrestor litigation, plaintiffs have deposed twenty-three current and former Blitz employees. Current and former Blitz employees who were potential custodians of discoverable documents unequivocally testified they never intentionally destroyed any document potentially relevant in the litigation and no one at Blitz ever stated or implied that Blitz documents should "go away." Those potential custodians who were not

deposed submitted supporting affidavits to the same effect. While most Blitz employees had never heard the legal term "litigation hold," they were aware of their obligation to retain potentially relevant documents. The breadth (and age) of the documents within Blitz's production further establishes that Blitz custodians understood and followed the directive to retain relevant documents.

> 2.    Neither Plaintiff Nor the Court Identify Destroyed Relevant Blitz Documents.

In the Fifth Circuit, failure to issue a written litigation hold is not per se evidence that relevant evidence was destroyed. *Rimkus*, 688 F. Supp. 2d 598.[11] Whether or not a party issued a formal "litigation hold" is not the dispositive factor—the proper inquiry is whether a party has satisfied its duty to preserve potentially relevant evidence. *See id.* at 612 – 613. *See also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 542 – 553 (D. Md. 2010) (Appendix of spoliation sanctions requirements by Circuit) (quoting *Tango Transp., LLC v. Transp. Int'l Pool, Inc.*, No. 5:08-cv-0559, 2009 WL 3254882, at *3 (W.D. La.

---

[11] But even where the bright line rule first originated, in *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec.*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010), and in its sister courts, it has become apparent that the realities of litigant's reasonable behavior and the impossibility of perfection in discovery require more flexible standards. In *Steuben Foods, Inc. v. Country Gourmet Foods, L.L.C.*, No. 08-cv-561, 2011 WL 1549450 (W.D.N.Y. Apr. 21, 2011), the court refused to impose sanctions and held that oral instruction was sufficient given the discreet number of players involved and that the responding party was a small enterprise. *See also Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08-cv-5463, 2011 WL 1792047 (S.D.N.Y. May 11, 2011) (defendant's efforts were sufficient despite later written hold); *Orbit One*, 271 F.R.D. at 429 (reasoning that other factors such as whether relevant evidence was actually destroyed may be more important in addressing the adequacy of a party's retention effort).

Oct. 8, 2009) ("Party with control over potentially relevant evidence has a duty to preserve it; scope includes evidence in possession of employees likely to have relevant information, i.e., 'the key players.'")). To further parse things out, surely a party might fail to issue a litigation hold and still preserve potentially relevant documents; or conversely, it might issue a litigation hold and still fail to satisfy its preservation obligations.

Ultimately, a necessary prerequisite to imposing sanctions for missing documents is actual evidence, testimony or otherwise, establishing that relevant documents are missing. USCA5 3182 (*Donald Thornton v. Blitz U.S.A., Inc.*, No. 5:09-cv-00003, at *13–*14 (S.D. Ga. Mar. 24, 2011 [ECF No. 322] ("Plaintiff unjustifiably assumes that there, in fact, was a flame arrester design project. . . . Plaintiff simply ignores the basic fact that he has not shown that a flame arrester [design] project existed at all.")). The identification of specific, missing documents is so fundamental a prerequisite to impose sanctions that the vast majority of the applicable law focuses on whether there is sufficient evidence that specific missing documents would have been relevant and/or favorable to the moving party's claims, and whether such documents were destroyed in bad faith. *See, e.g.*, *Escobar v. City of Houston*, No. 04-1945, 2007 WL 2900581, at *19 (S.D. Tex. Sept. 29, 2007) ("Without evidence that the information was relevant or was destroyed in bad faith, this court cannot impose the severe sanction the

plaintiffs seek."); *Rimkus*, 688 F. Supp. 2d at 616 – 617, n.15 ("Courts have held that speculative or generalized assertions that the missing evidence would have been favorable to the party seeking sanctions are insufficient."). *See generally Orbit One*, 271 F.R.D. at 438 – 439 (collecting cases discussing whether extrinsic evidence supported an inference that missing evidence would have been harmful to the responding party). So, for example, in another case before the Court below, the moving party identified specific interoperability testing documents that a deponent testified had been destroyed. *Tantivy Commc'ns, Inc. v. Lucent Tech. Inc.*, Civ. No. 2:04-cv-79-TJW, 2005 WL 2860976, at *2 (E.D. Tex. Nov. 1, 2005) (J. Ward).

Here, the record does not show any specific, missing relevant documents. Plaintiff's own counsel interrupted his questioning of Mr. Chrisco to clarify: "First of all [Mr. Chrisco], I'm not—I want you to know right now that I'm not suggesting you did anything—that you destroyed any documents." *Id.* at 69:20 – 22. Mr. Hale testified that no one at Blitz had been told to delete any business-related documents or emails. USCA5 *2620*. David Price understood to "delete spam." USCA5 2318. The District Court does not cite a single example of a specific electronic document that is known to be no longer available. Instead, the Court merely <u>assumed</u> relevant documents were destroyed because of the absence of a formal litigation hold and periodic e-mails from Blitz's IT department to free

up server space by deleting or archiving unnecessary e-mails. Those factors, alone, clearly fall short of the evidence necessary to support a finding that Blitz engaged in the sanctionable destruction of documents.[12]  The District Court's finding that electronic documents were lost without identifying any specific missing documents was clearly erroneous, and, accordingly, the decision should be overturned and the sanction reversed. *See Rimkus*, 688 F. Supp.2d at 617 – 18 ("The Fifth Circuit has not explicitly addressed whether even <u>bad faith</u> evidence allows a court to presume that the destroyed evidence was relevant or its loss prejudicial.") (emphasis added).

> D.     The Court Was Without Jurisdictional Authority and Abused its Discretion in Issuing "Scarlett Letter" Sanctions.

Sanctions must be just and <u>specifically related to the particular claim</u>. FED. R. CIV. P. 37(b)(2).  The power to issue sanctions extends only so far as there exists a nexus between the sanctions and a particular claim before the court. *See Compaq Computer Corp. v. Ergonome Inc.,* 387 F.3d 403, 413 (5th Cir. 2004) (citations omitted) (specifying that "claim" means the claim "that was the subject of the discovery violations").  The District Court here imposed sanctions that

---

[12] Further, Magistrate Judge Everingham disregarded all of Plaintiff's earlier briefing on the Paul Hale emails. Paul Hale's emails were not addressed in the Magistrate Judge's *Green* Report and Recommendation. USCA5 2780 – 2792. This issues was raised in the District Court's Order, but without any reference to the responses set forth in Blitz's earlier briefing on the issue, docket entry number 233, as if it were overlooked by the Court. USCA5 3040 – 3042.  Blitz's use of backup tapes was not even briefed below.  It was not part of the Magistrate Judge's Report and Recommendation.  USCA5 2780 – 2792.  Blitz had no opportunity to address the issue before it appeared in the Sanction Order.

extend beyond the claim before it and that extend to cases before other courts. The District Court imposed sanctions that apply irrespective of the type of case— contractual, employment, etc.—not to mention irrespective of whether there were claims made before those courts that were the subject of discovery violations.

In general, a *civil* sanction occurs prior to judgment or settlement, and the permissible purpose of the sanction is to compensate a complainant for loss or to coerce compliance with a court order. *Andrews,* 256 F.R.D. 136. The court must find that the deterrent value of Rule 37 could not be achieved through the imposition of lesser sanction. *ClearValue, Inc.*, 560 F.3d at 1306 (citations omitted). Inherent power is a limited power, not to be considered "ready at an imperial hand." *Chambers*, 501 U.S. at 42.

Ordering Blitz to file the District Court's Order in other cases/jurisdictions does not compensate Plaintiff. Further, this portion of the Sanction Order would reach the perverse result of requiring Blitz to file a decision in courts where the same or similar claims were already evaluated, with those courts reaching a different conclusion than the District Court here.[13] Not only does the absence of authority to impose such a sanction require its reversal, principles of comity suggest that imposing this sanction was an abuse of the District Court's discretion.

---

[13] *See supra*, notes 6 and 7.

Blitz has found no precedent for post-settlement sanctions orders requiring a party to file a court's decision in closed, pending, and future cases in other jurisdictions.  The District Court relied on the *Fleming* case for its authority to impose sanctions in a settled case: "The Fifth Circuit has stated 'we recognize that a district court always has jurisdiction to impose sanctions designed to enforce its own rules, even after that court no longer has jurisdiction over the substance of the case.'"  USCA5 3030 (citing 529 F.3d at 638).  Even if the District Court were correct about the general authority to impose sanctions in certain circumstances after a case has settled, *Fleming* provides no support for the proposition that a Court may require a party in a settled case to file its decision in closed, pending, and future cases in other jurisdictions.  The reputational sanction at issue in *Fleming* was limited to the court's admonishments in its written opinion, not something the litigant was required to file elsewhere.  *Id.*  The District Court made no legal findings about its jurisdictional authority to impose this severest of scarlet letter sanction.  Neither *Fleming* nor Rule 37(b) permits this extra-jurisdictional sanction.

In addition, the sanction is not the least severe sanction available to accomplish the Court's objectives.  The sanction does not compensate the Plaintiff or serve to enforce Blitz's compliance with the Court's discovery order.  The case has settled and is closed.  The Order serves no other purpose as the documents

made the basis of the Order were located and produced <u>by Blitz</u>.  The District Court abused its discretion in requiring its decision to be filed in closed, pending, and future cases in other jurisdictions, and should be reversed as serving none of the permissible purposes for imposing sanctions.

X.

CONCLUSION

Plaintiff settled her case and fully released Blitz.  Over a year after she delivered her release, Blitz located documents that were discoverable but not produced in *Green*.  The subject documents were not hidden, and their current existence establishes that the documents were not destroyed.  Rather, the Blitz custodians simply did not locate the complained-of documents before the *Green* trial.  Despite the broad release language and Blitz's lack of culpability, the Court incorrectly granted civil compensatory sanctions to Plaintiff.

Further, without any supporting evidence, the *Green* Court ruled that Blitz had destroyed documents.  The Court solely relied on the lack of a formal litigation hold and the periodic emails from Blitz's IT department reminding users to delete or archive unnecessary emails to free server space.  There is no evidence that a relevant document was destroyed, much less with the culpability necessary to support the *Green* Court's Order.  Defendant-Appellant Blitz respectfully requests

that this Court reverse the District Court's decision, its findings, the monetary award to Plaintiff, and the scarlet letter sanctions.

Respectfully submitted,

s/      Adrienne L. Hernandez
Adrienne L. Hernandez
SHOOK, HARDY, & BACON. L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
816.559.2574 (telephone)
816.421.5547 (facsimile)
ahernandez@shb.com

David E. Jones
LOGAN & LOWRY, LLP
102 E. 3rd Street
P.O. Box 452469
Grove, OK 74345-2469
918.786.7511 (telephone)
918.786.5687 (facsimile)
djones@loganlowry.com

Michael Bridwell
Texas State Bar No. 02979600
STRONG, PIPKIN, BISSELL, & LEDYARD, L.L.P.
595 Orleans, Suite 1400
Beaumont, Texas 77701
409.981.1000 (telephone)
409.981.1010 (facsimile)
mbridwell@strongpipkin.com

**ATTORNEYS FOR DEFENDANT
BLITZ U.S.A., INC.**

Dated: June 30, 2011

XI.

**CERTIFICATE OF COMPLIANCE**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of FED. R. APP.
P. 32(a)(7)(B) because:

X    this brief contains 13,988 words, excluding the parts of the brief
exempted by FED. R. APP. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains [*state the number
of*] lines of text, excluding the parts of the brief exempted by FED. R.
APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FED. R. APP.
P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

X    this brief has been prepared in a proportionally spaced typeface using
Microsoft Office Word 2007 in Times New Roman 14 point font, *or*

☐    this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state number of
characters per inch and name of type style*].

s/ Adrienne L. Hernandez

a

## XII.

## CERTIFICATE OF SERVICE

I hereby certify that I personally electronically served a copy of the foregoing document, based upon written consent, on E. Todd Tracy, The Tracy Law Firm, 5473 Blair Road, Suite 200, Dallas, TX 75231, and Darren Grant, Grant & Flanery, P.C., 216 W. Erwin, Suite 200, Tyler, TX 75702 on this 30th day of June, 2011.

/s/ Adrienne L. Hernandez
Adrienne L. Hernandez

b